## STEWART HALL CHEMICAL CORP., Plaintiff,

v.

## IDEAL TRUCKING CO., Defendant.

### No. 81 CIV 4334 (LBS).

United States District Court,
S.D. New York.

Nov. 5, 1982.

Pomeranz & Pomeranz, Joseph Pomeranz, Howard M. Rubin, New York City, for plaintiff.

Bobroff, Olonoff & Scharf, Herbert Scharf, New York City, for defendant.

## OPINION

SAND, District Judge.

This diversity action which has been tried to the Court involves the purchase by plaintiff, a New York corporation, of acrylic scrap from defendant, a New Jersey corporation. The following Opinion constitutes our findings of fact and conclusions of law pursuant to F.R.Civ.P. 52(a).

Plaintiff's main activity is the manufacture of chemicals for the heating and cooling industry and prior to the summer of 1979, plaintiff had not engaged in the sale of acrylic materials. In 1979, plaintiff's agent in Korea asked if a particular type of acrylic scrap could be obtained here for export to that country. Plaintiff's general manager, Harold H. Hessel, testified that he attempted to locate such scrap and located a source in Brooklyn, the Rayall Plastics Company. Plaintiff purchased 1100 pounds of scrap from Rayall which was shipped to Korea. Plaintiff next learned from their agent in Korea that the customer wished to purchase comparable scrap in volume. Hessel learned that Rayall was not able to furnish the scrap in the quantities required and he sought other sources, a search which ultimately led him to the defendant.

Defendant Ideal Trucking Company is engaged in accumulating various types of scrap material from a variety of sources and reselling the scrap in bulk for recycling.

Hessel testified that he first spoke to an Ideal employee named Sam Barry and explained to him that he was looking for 30,000 pounds of acrylic scrap that could be melted to its monomer form.

[As plaintiff's expert witness, Arthur S. Nyquist, testified, acrylic scrap made from poly methyl methacrylate ("pmm") is a long chain of polymers joined together to form a clear plastic used as window glass, for molding as in lenses, for automobile dashboards and like products. Its most relevant characteristic for purposes of this proceeding is that a fabricated piece of pmm scrap can be melted back to its monomer form—a process known as "cracking." In other words, the process of uniting the components into the polymer form of the plastic can be reversed so that the salvager ends up with the basic building block of the chemical process, the monomer. This monomer may then be utilized to fabricate new poly-monomer forms.

This plastic is to be contrasted with another acrylic, XT polymer, which contains styrene and which cannot be reduced to a monomer form. XT polymer scrap may be reground and refashioned (and this is sometimes done to make low quality discardable items like flower pots) but it is impossible to reduce the product to its basic monomer form so that it may be reused as if it had never before been combined in a polymer form with styrene.]

After his conversation with Barry, plaintiff next spoke on the telephone with William Bolton, the defendant's principal. According to Hessel, Bolton said that he knew what kind of scrap plaintiff wanted and that it would take some time to accumulate. Hessel stated that he repeated that the scrap desired was of a type that could be melted to monomers and Bolton repeated that he was aware of this.

According to Hessel, some week or two later he heard from defendant that the 30,000 pounds of scrap had been accumulated and the paper work which we will detail in a moment began.

Defendant's version of the early dealings with Hessel differs radically from the foregoing. Bolton testified that he gave Hessel a sample of the virgin and reground scrap which he had on hand. He thereafter heard from Hessel who said ship the material.

Hessel emphatically denies that he received a sample prior to this first shipment or, contrary to Bolton's testimony, the three ensuing shipments. The first two of the four shipments were in fact of the pmm desired by the Korean customer. The third and fourth shipments were of XT acrylic mixed with pmm. The first shipment is therefore relevant not because it is itself in dispute but because it furnishes the background for the parties' later dealings and understandings.

Resolution of the clear conflict in the testimony as to sampling is not an easy matter. Both Hessel and Bolton disclaim any expertise in the field of acrylic plastic. Hessel testified that he only once visited defendant's premises and this was on November 14, 1980. He stated that the purpose of his visit was to look over the defendant's operation because the Korean customer had indicated that he wanted larger quantities and more frequent shipments and Hessel thought he should see firsthand with whom he was dealing. He denies that he returned from this single visit with any scrap sample or that, at any prior time, the defendant had delivered any scrap sample to him.

Our determination based on an observation of the witnesses and all of the facts and circumstances of the case is that defendant did not furnish samples of the scrap to plaintiff prior to each of the four shipments but that the parties relied on the oral conversations recited above and the paper documentation as to which issues of credibility are also present.

Hessel testified that when Bolton advised him that he had the required 30,000 pounds of scrap available, he advised his Korean agent to have the customer proceed to process a letter of credit which would also serve

as an order, and on August 26, 1979, he had prepared and sent to defendant a purchase order for "30,000 Lbs. Reground Acrylic Scrap" (Ex. 10). According to Hessel, the next day a second purchase order was sent because he learned there had been an incorrect shipping date and because the description of the goods purchased was not as it should have been. The amended purchase order lists a different vessel for carriage of the shipment and describes the goods as "30,000 lbs. Acrylic Scrap made from MMA Monomer." Defendant denies ever receiving the amended purchase order. Plaintiff is unable to produce any of the original multiple copies of the purchase order which should have remained in its files and has produced only a photocopy of the purported amended purchase order (Ex. 11). Defendant also notes that its invoice to plaintiff for this shipment refers to Customers Order 82079HHH [1] (Ex. 10) not to the so-called amended purchase order 82179 (Ex. 11).

Plaintiff, to the extent to which it relies on defendant's receipt of Ex. 11, has the burden of proving that it was mailed in the normal course of business and was thereafter presumably received by the defendant. Here, however, plaintiff is unable to account for the absence from its files of the original multiple copies of Ex. 11, its receipt was never acknowledged by the defendant and defendant's later documents refer only to the prior invoice. We find that plaintiff has not established that Ex. 11 was in fact mailed to and received by defendant.

The goods called for by either version of the purchase order were in fact delivered to the customer in Korea, the letter of credit was honored and there is no controversy directly related to this first shipment.

Plaintiff next received an order from the same customer for 44,000 lbs. Hessel telephoned Bolton and told him that the customer had been satisfied with the quality of the prior shipment. Bolton said that he could supply the 44,000 pounds at the same price. Again plaintiff obtained a letter of

1. Plaintiff did not number its purchase orders sequentially but used the month, date and year for the purchase order number. Thus 82079 refers to an order of Aug. 20, 1979.

credit from the customer and on March 3, 1980 issued a purchase order. Ex. 15. Although defendant denies that it ever received this purchase order, plaintiff has produced two of the original multiple copies of this order from its file and the Court finds that it was mailed to the defendant in the ordinary course of plaintiff's business, pursuant to office procedures adequately described by plaintiff and was presumably received by defendant. Ex. 15 describes the goods purchased as "44,000 lbs. Acrylic Scrap (same as 9/79 material shipped for melting to acrylic monomer)."

All went well with this shipment. The goods were delivered to the Korean customer and were satisfactory. The letter of credit was honored and all the other documentation attendant on the export was satisfactorily completed.[2]

All of which is prelude to the third and fourth shipments which are the heart of this controversy.

Plaintiff received a third order through its Korean agent and Hessel telephoned Bolton, advising him of the order and the desired quantity. Bolton said that he could obtain the material within a month. Plaintiff contends, and the Court finds that it sent and defendant is presumed to have received, a confirming purchase order. Ex. 19. This order calls for "50,000 lbs Acrylic Scrap for melting to acrylic monomer—as previously shipped." (As noted *supra,* and for the reasons set forth therein, the Court rejects defendant's contention that the purchase orders were never received and that the purchase was arranged only after defendant delivered a sample of the scrap.)

Thereafter, defendant notified plaintiff that it was ready to make the shipment and the relevant documents were again prepared. (The information as to number of containers needed for the bill of lading was obtained from defendant; the other information was obtained from the letter of credit.) The defendant presented its invoice to the plaintiff, supported by the bill of lading and dock receipt, and was paid in full. The Korean customer's letter of credit was honored, and plaintiff was also paid in full.

While the third shipment was on route to Korea, plaintiff, on the request of its Korean customer, arranged a fourth shipment to supplement the third shipment. As with the prior shipments, letters of credit were received from the Korean customer,[3] and the plaintiff ordered shipment from the defendant. The defendant presented the appropriate documents evidencing that the load had been properly delivered to the pier for shipping, and was paid in full by the plaintiff.

The letters of credit for this fourth shipment were not honored when presented, due to a technical defect. When plaintiff attempted to have the Korean customer waive the defect, it learned for the first time that the goods shipped as the third order in December were nonconforming. Hessel testified that he telephoned Bolton the first week in March, 1981 and was told by Bolton that the scrap he had shipped in December was better, stronger and more durable than what had been shipped previously.

The plaintiff sues herein for the damages arising out of the non-payment by the Korean customer for the fourth shipment and for the potential liability it faces with respect to the third shipment, for which it expects to have to refund the Korean customer's payments. Subsequent testing of the material in fact shipped as the third and fourth shipments discloses that they were of XT acrylic scrap and pmm comingled in a

---

2. In the case of all four shipments, the letters of credit, bills of lading and other such documents refer to the cargo in various forms but all contain the concepts of pmm or scrap for reduction to a monomer state.

3. The "January shipment" in fact was composed of a letter of credit for 50,000 pounds received in early January and a further letter of credit order of 19,100 pounds received on January 21st. These two orders were treated by the defendant as a single purchase order for approximately 69,000 pounds. We therefore refer to these orders as a single "fourth" shipment.

fashion which made it commercially unusable.[4]

Plaintiff has tendered the goods back to the defendant, which has rejected the tender and the goods remain at the Customs facility in Korea. Plaintiff has attempted unsuccessfully to mitigate damages by finding another purchaser for the scrap.

## Discussion

Our fact findings set forth above with respect to the absence of sampling and the receipt by defendant of all but the first amended purchase invoice, resolve many of the issues in this case.

We believe, however, that the parties overemphasize the significance of some of the documentation. The oral conversations between the parties and the evolution of their relationship support plaintiff's contention that it purchased what was warranted to be pmm acrylic scrap and received XT acrylic scrap—a different product not suitable for the disclosed intended use of the scrap, which was reduction to its monomer state.

Neither businessman conducted these transactions with the care and degree of supervision which hindsight tells us would have been appropriate. Plaintiff did not sample or inspect the goods shipped. It regarded itself as a mere conduit or middleman, earning a commission and performing few services other than preparation of the export documents.

Defendant's principal disclaimed any expertise with respect to acrylic scrap and claimed that he believed that all acrylic scrap was basically the same and that he just learned about XT scrap after the last shipment to Korea.

But Mr. Bolton's disclaimer of knowledge must be taken with a large grain of salt. He testified that he personally acquires the scrap material and sets the price after field testing by burning, which establishes the quality of the scrap. The expert testimony established that pmm burns cleanly and without odor while XT gives off a distinctive rubbery smoke when burned.

At the least, Mr. Bolton should have known that plaintiff desired the same goods as it had previously ordered for the same customer—that this was essentially a reorder of goods previously purchased. Mr. Bolton should also have known that, regardless of its precise chemical composition, the scrap shipped in the last two shipments was of a different nature than the scrap previously delivered.[5] Mr. Bolton did not alert plaintiff to this fact but took it upon himself to assume, erroneously, that the scraps were interchangeable.

This case compels a determination of which party should bear the loss for this error. We believe that the plaintiff has sustained its burden of proving that the loss should be borne by the defendant.[6]

Plaintiff is therefore entitled to judgment:

a) awarding it its actual out-of-pocket damages sustained to date stemming from the fourth, non-conforming January shipment;

b) awarding it its expected profits from the January shipment, calculated on the basis of plaintiff's sale agreement with its Korean customer; and

c) indemnifying it against any further losses that might be sustained by virtue of claims asserted by its Korean customer and securing said indemnification by an appropriate bond or other security. Since defendant is the real party in interest with

---

4.  Defendant's scrap expert suggested that the scrap should be sent to India where cheap labor could segregate the two types of scrap by hand.

5.  As noted *supra,* he described the scrap of the third and fourth shipments as being "stronger" and "more durable."

6.  It cannot validly be contended that plaintiff accepted the goods because it paid defendant prior to learning of the non-conforming nature of the third shipment. Plaintiff acted with appropriate diligence once it learned that the goods that had arrived in Korea were found to be non-conforming.

respect to such claims, it shall be entitled to receive notice thereof and be afforded an opportunity to appear and defend.

Settle order on notice.